IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Joseph Anthony Ciampa, D.D.S.,      :
                                    :
                  Petitioner        :
                                    :
         v.                         : No. 1350 C.D. 2024
                                    : Argued: September 11, 2025
State Board of Dentistry,           :
                                    :
                  Respondent        :


BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
          HONORABLE MICHAEL H. WOJCIK, Judge (P.)
          HONORABLE MATTHEW S. WOLF, Judge

OPINION NOT REPORTED


MEMORANDUM OPINION
BY JUDGE WOJCIK                              FILED: January 27, 2026


Joseph Anthony Ciampa, D.D.S. (Dentist), petitions for review of the September 17, 2024 Final Order of the State Board of Dentistry (Board), which adopted the Hearing Examiner's Proposed Adjudication and Order (PAO) suspending Dentist's license to practice for at least three years, retroactive to July 16, 2023, due to Dentist's violation of a Consent Agreement. The Consent Agreement, enacted pursuant to the Dental Law (the Act),[1] provided that the Board would stay the suspension of Dentist's professional license in favor of a supervised probationary period, contingent upon Dentist obtaining treatment for the impairments that had interfered with Dentist's ability to practice the profession with

---

[1] Act of May 1, 1933, P.L. 216, *as amended*, 63 P.S. §§120-1301.

reasonable skill and safety. The Consent Agreement also provided that Dentist would enroll in and complete a voluntary recovery program.

At issue now, Dentist undertook unapproved employment with Direct Dental despite the voluntary recovery program's recommendation that Dentist forgo his professional practice, enroll in an inpatient care program, and have his clinical competency evaluated. Before this Court, Dentist argues that the Board erred in concluding that he violated the Consent Agreement because the recommended treatments sought to treat impairments outside of the Consent Agreement's scope. Upon careful review, we affirm.

## I. Background

Relevant now, the Board first issued Dentist his license to practice dentistry on December 19, 2002. Reproduced Record (R.R.) at 398a. However, from 2006 to 2010, and again from 2017 to 2019, Dentist suffered from chemical abuse or dependency relating to alcohol and marijuana. *Id*. at 399a. Dentist also briefly struggled with chemical abuse or dependency relating to cocaine in 2007. As a consequence, Dentist has suffered "criminal arrests, problems in family relationships, and decline in amount of work." *Id*. Further, on July 19, 2019, Dentist was diagnosed with depression. *Id*.

The Board therefore determined that it was appropriate to suspend Dentist's license as he was "unable to practice dentistry with reasonable skill and safety to patients by reason of illness, drunkenness, excessive use of controlled substances, chemical or any other type of material, or as the result of any mental or physical condition." R.R. at 400a. However, in a Consent Agreement, wherein Dentist stipulated to the dependencies referenced above, the Board stayed

2

enforcement of this suspension in favor of probation for no less than three years, retroactive to April 30, 2020. PAO at Finding of Fact (F.F.) No. 6.

The Consent Agreement required Dentist to submit to monitoring by the Professional Health Monitoring Program (the PHMP). PAO at F.F. No. 9. The PHMP "works on behalf of the Department of State to monitor license[d] healthcare individuals, such as [Dentist], who agree to monitoring as part of a consent agreement." *Id*. at F.F. No. 10. In turn, the PHMP required Dentist to enroll in a peer-assistance program that assists the PHMP with monitoring healthcare professionals (the Physician's Health Program or PHP). *Id*. at F.F. No. 13.

Dentist was compliant with all of the Consent Agreement's requirements through May 1, 2022. PAO at F.F. No. 14. In fact, in October 2020, the PHMP issued an approval to Dentist to resume his professional practice subject to the terms of the Consent Agreement and Dentist notified the PHMP of several part-time jobs he had accepted until April or May 2022. *Id*. at F.F. No. 15.

However, in April 2022, Dentist underwent a PHP-mandated evaluation. Dentist's chosen provider, Pine Grove Enhancement Program (Pine Grove), [2] determined that Dentist was not fit to engage in professional practice at that time and likewise recommended that Dentist submit to an inpatient professional program[3] as well as a clinical competency evaluation. PAO at F.F. No. 16. In May

---

[2] While the PHP mandated the evaluation, the PHP provided Dentist with information to select one of a few treatment providers to conduct the evaluation. Dentist selected Pine Grove in Hattiesburg, Mississippi. *See, e.g.*, Examiner's Hearing, 10/16/23, Notes of Testimony at 129.

[3] Dentist contends that Pine Grove recommended inpatient treatment to treat his alleged antisocial personality disorder. Dentist's Brief at 6. Pine Grove's discharge summary, however, recommends treatment for "disruptive behavior." *See* R.R. at 443a. Indeed, the Board amended the PAO's findings of fact to clarify that the purpose of the inpatient treatment was to treat his **(Footnote continued on next page…)**

3

or June 2022, the PHP gave Dentist verbal notice of its conclusions. *Id*. at F.F. No. 17. However, Dentist explained that because he was not working at that time, he could not afford inpatient treatment. Thus, neither the PHMP nor the PHP mandated immediate treatment. *Id*. at F.F. No. 18.

Notwithstanding the PHP's recommendation to forgo professional practice, Dentist began working for Direct Dental in Lewistown, Pennsylvania on August 19, 2022. PAO at F.F. No. 21. His employment with Direct Dental continued until November 25, 2022.[4] *Id*.

Dentist, however, did not disclose this employment to the PHP until October 4, 2022, or to the PHMP until October 14, 2022. PAO at F.F. Nos. 22-23. In subsequent correspondence with his PHMP Case Manager, Dentist expressed his belief that the PHP's concerns exceeded the scope of the Consent Agreement. For his part, the Case Manager reminded Dentist of the pertinent Consent Agreement provisions and requested that he not undertake employment involving his professional license. *Id*. at F.F. Nos. 29-33.

The Bureau of Professional and Occupational Affairs (BPOA) filed a Petition for Appropriate Relief (PAR) with the Board on June 16, 2023. The Board's Probable Cause Screening Committee consequently rendered a Preliminary Order terminating Dentist's probation and thereby indefinitely suspending his license for at least three years. After Dentist filed a counseled answer to the PAR, the Hearing Examiner conducted an administrative hearing on October 16, 2023. Therein, the Hearing Examiner heard the testimonies of Dentist, his Case Manager with the

---

disruptive behavior in the workplace. Final Order at 3. Thus, Dentist's assertion in this regard is not supported by the record.

[4] Direct Dental terminated its employment of Dentist. *See* PAO at F.F. Nos. 24-25, 34.

4

PHMP, and the PHP's director of peer assistance monitoring, among others. Ultimately, the Hearing Examiner concluded that Dentist had committed 12 violations of the Consent Agreement.[5] PAO at Conclusions of Law (C.L.) Nos. 4-16.

In relevant part, the Hearing Examiner rejected Dentist's principal argument that the proceedings against his license were predicated on an overly expansive view of the Consent Agreement. "[T]he scope of [Dentist's] 'impairment' as delineated in the Consent Agreement includes substance-abuse issues that have led to social issues and work issues and also the mental-health issue of depression." PAO at 13. Thus, in the Hearing Examiner's view, although the Consent Agreement does identify Dentist's substance-abuse issues and depression as "impairments" that the PHMP and its agents were to monitor, the Hearing Examiner reasoned that Dentist's "impairments" include the other behavioral issues identified in the Consent Agreement that prevented his ability to practice dentistry with reasonable skill and safety. *Id*. at 13-14.

Regarding the sanction, the Hearing Examiner observed that the BPOA did not seek the harshest sanction available to it: a suspension of Dentist's license for a period of three years. Rather, the BPOA merely sought suspension of Dentist's license until he came into compliance with the PHP's recommendations. However, the Hearing Examiner determined:

> No mitigating evidence has been presented that would justify departure from the agreed-upon terms of the Consent Agreement. Even if the Board were to excuse [Dentist's] failure to undergo the recommended treatment

---

[5] More particularly, the Hearing Examiner concluded that Dentist violated Paragraphs 7(e)(1), (3), (4), (11), (12), (13), (17), (26), (27), (30), (31), and (32) of the Consent Agreement. *See* PAO at C.L. 4-6, 8-16.

and evaluation and his refusal to cease practice in deference to his sincerely [] held but unjustified contentions about the scope of the PHMP's authority, [Dentist] still flagrantly and seemingly unapologetically violated [four provisions of the Consent Agreement]. The evidence suggests that the PHMP's supervision may not be an appropriate vehicle for ensuring [Dentist's] Compliance with the Act.

PAO at 19. Thus, the Hearing Examiner proposed that Dentist's license be suspended indefinitely for at least three years retroactive to July 16, 2023.

By letter dated December 11, 2023, the Board notified the parties of its intention to review the Hearing Examiner's PAO regardless of whether Dentist filed exceptions thereto, although Dentist did so anyway. Certified Record (C.R.) at Item Nos. 16-17. On exceptions, Dentist once again argued that the PHP's concerns regarding his clinical competency or behavior unrelated to his substance abuse issues or depression were beyond the scope of the Consent Agreement.[6] However, Dentist also argued that the Hearing Examiner abused his discretion in imposing a three-year suspension for Dentist's violation of the Consent Agreement. C.R. at Item No. 17.

The Board ultimately adopted the PAO in a Final Order dated September 17, 2024. While the Board largely agreed with the Hearing Examiner, it saw fit to amend Finding of Fact No. 16 to read:

In June of 2022, following a PHP-mandated evaluation at [Pine Grove], the PHP concluded that [Dentist] needed to submit to inpatient professional's treatment for disruptive behavior in the workplace and complete a clinical competency evaluation, and to stop the practice of the profession at this time.

---

[6] In a discrete issue, Dentist also styled this claim as an abuse of the Hearing Examiner's discretion. *See* C.R. at Item No. 17.

6

Final Order at 3. Further, the Board explained that the purpose of the hearing below was to determine whether Dentist had violated the Consent Agreement that he entered into as an Impaired Professional under the Act. *Id*. at 4-5 (citing 63 P.S. §130g(c)). The Board reasoned that Dentist's pervasive focus on the impairments giving rise to the Consent Agreement ignored the object of the same: rehabilitating Dentist's ability to practice dentistry with reasonable skill and safety. *Id*. Concerning the remaining exceptions, the Board relied on the copious testimonial evidence adduced at the formal hearing in concluding that the Hearing Examiner's decision was supported by substantial evidence, *see id*. at 5-11, and that the Hearing Examiner's sanction was appropriate in light of the seriousness of Dentist's violations. *Id*. at 12-13. Dentist's timely Petition for Review followed.

## II. Issues

Before this Court, Dentist asserts that: (1) the Board erred by concluding that Dentist violated the terms of the Consent Agreement when he abstained from the recommended evaluation for clinical competency and inpatient treatment; (2) a three-year suspension is an inappropriate sanction; and (3) the Board unlawfully delegated its decision-making authority to third parties.

## III. Discussion

### *A. Dentistry Board's Disciplinary Power*

At the outset, the Board maintains discipline in the dental profession through the Act's provisions permitting the Board to review applications for licensure and to initiate enforcement actions. *See generally* Sections 3 and 4.1 of the Act, 63 P.S. §§122, 123.1. Specifically, Section 4.1(a)(11) of the Act provides:

7

The [B]oard shall have authority, by majority action, to refuse, revoke or suspend the license of any dentist . . . for any or all of the following reasons:

> (11) Being unable to practice dentistry . . . with reasonable skill or safety to patients by reason of illness, drunkenness, excessive use of controlled substances, chemicals or any other type of material, or as the result of any mental or physical condition . . . .

63 P.S. §123.1(a)(11). Even where cause exists for the Board to revoke or suspend a dentist's license, the Act permits the Board to "[s]uspend enforcement . . . and place a licensee . . . on probation with the right to vacate the probationary order for noncompliance." *Id*. §123.1(b)(7).

### *B. Scope of the Consent Agreement*

To this end, as it concerns impaired professionals, the Act permits the Board to stay a licensee's suspension and enter into a consent agreement with the Board. Section 11.6(c) of the Act provides:

> An impaired professional who enrolls in an approved treatment program shall enter into an agreement with the [B]oard under which the professional's license shall be suspended or revoked, but enforcement of that suspension or revocation may be stayed for the length of time the professional remains in the program and makes satisfactory progress, ***complies with the terms of the agreement and adheres to any limitations on his practice imposed by the [B]oard to protect the public*** . . . .

63 P.S. §130g(c) (emphasis added).

More broadly, a consent agreement or consent order "is an agreement reached in an administrative proceeding between parties one of which is usually the

8

agency's litigation staff." 2 Administrative Law and Practice (ADMLP) §5:43 (May 2025) (3d ed.). Because the other party or parties to a consent agreement participate in its settlement, "[o]ne who has agreed to the settlement is not denied a meaningful opportunity to be heard in violation of due process." *Id*. In the context of professional and occupational affairs, this Court has explained that a "consent [agreement] has the same effect as an adjudication issued in accordance with the Administrative Agency Law." *Kenney v. State Board of Pharmacy*, 203 A.3d 421, 427 (Pa. Cmwlth. 2024); *see also* 2 ADMLP §5:43 (an agency's consent agreement or order is akin to a court's issuance of a consent decree). We have also described consent orders as being "in essence a contract binding the parties thereto." *Id*. (quoting *Cecil Township v. Klements*, 821 A.2d 670, 674 (Pa. Cmwlth 2003)). We therefore construe the provisions of a consent agreement as we would a contract; interpreting the consent agreement as a whole. *Id*.

Relevant to the parties' arguments, Paragraph 7(e)(1) of the Consent Agreement provides: "[Dentist] shall fully and completely comply and cooperate with the PHMP and its agents and employees in their monitoring of [Dentist's] ***impairment under this [Consent] Agreement***." R.R. at 402(a) (emphasis added).

Dentist's argument principally seizes on the above-bolded language. In his view, the PHP's recommended inpatient treatment and competency evaluation are not contemplated as "impairments" under the Consent Agreement. Dentist's Brief *passim*. The specific impairments identified by the Consent Agreement, Dentist proffers, are his struggle with substance abuse relating to alcohol, marijuana, and cocaine, as well as his clinical depression. *Id*. at 13.

Likening the instant matter to this Court's decision in *Kenney*, 203 A.3d at 427, Dentist asserts that we cannot interpret the Consent Agreement to offer

Dentist an illusory promise or otherwise permit the Board to unilaterally add new terms. Dentist's Brief at 15. In Dentist's estimation, by suspending his license for his refusal to comply with recommendations unrelated to his impairments, "[t]he Board has unilaterally expanded the scope of the contract to cover additional purported impairments for which the record lacks any factual support." *Id*. at 20. At bottom, Dentist fears that our approval of the decisions below would grant the PHMP, and its employees and agents, "unfettered discretion to enforce any recommendation that it selects upon" Dentist regardless of its relation to the Consent Agreement. Dentist's Brief at 17.

Finally, Dentist argues that the Commonwealth possesses a myriad of options for addressing the PHMP's and PHP's fears concerning his clinical competency or mental health. For example, it could have filed a Petition to Compel a Mental and Physical Examination under Section 4.1(9a)(11) of the Act, 63 P.S. §123.1(a)(11). Dentist's Brief at 21. The Board has, instead, countenanced the unilateral revision of the Consent Agreement, by outside providers, between itself and Dentist. *Id*.

The Board responds by arguing that the inverse is true: where Dentist complains that the Board has taken too expansive a view of the Consent Agreement's provisions, Dentist's view of the same is too narrow. Board's Brief at 15. Rather, Dentist seeks to isolate certain stipulated facts identified in the Consent Agreement as the sole impairments that the PHMP or its agents may monitor, but not others. In any case, the Board notes that Sections 4.1(a)(11) and 11.6(c) of the Act, 63 P.S. §§123.1(a)(11), 130g(c), as well as the Consent Agreement, clearly identify the rehabilitation of the professional's ability to practice dentistry with reasonable skill and safety, through compliance with the Consent Agreement, as the paramount

objective of the Board's duties concerning impaired professionals, such that a pervasive focus on any particular impairment is misleading. Board's Brief at 11.

Here, the Consent Agreement does not leave the term "impairment" undefined. Paragraph 7(a) of the Consent Agreement provides:

> The Board finds that it is authorized to suspend, revoke or otherwise restrict [Dentist's] authorization to practice the profession under Section 4.1(a)(11) of the Act, 63 P.S. §123.1(a)(11), in that [Dentist] is unable to practice dentistry with reasonable skill and safety to patients by reason of illness, drunkenness, excessive use of controlled substances, chemicals or any other type of material, or as the result of any mental or physical condition (hereinafter "impairment").

R.R. at 400a-01a. Indeed, as the Hearing Examiner noted, *see* PAO at 13, the Stipulated Facts in the Consent Agreement do not solely identify Dentist's substance abuse and depression as the impairments giving rise to the agreement. Rather, the Consent Agreement explicitly identifies the resulting "criminal arrests, problems in family relationships, []decline in amount of work" and treatment at numerous behavioral and counseling centers alongside his substance abuse and depression. R.R. at 399a. Thus, reading the provisions of the Consent Agreement together, Paragraph 7(e)(1) of the Consent Agreement must fairly include the disruptive behaviors identified by Pine Grove, *see* Final Order at F.F. No. 16, as impairments subject to the PHMP's and PHP's monitoring.

Even if this interpretation of Paragraph 7(e)(1) is too liberal, as Dentist suggests, it is of no moment given the fact pattern before us. Dentist has proceeded throughout this litigation as if a narrow reading of Paragraph 7(e)(1) would absolve Dentist of his persistent noncompliance with the Consent Agreement. However, this single provision does not govern the scope of the entire Consent Agreement.

11

For example, Paragraph 7(e)(12) of the Consent Agreement provides that Dentist "shall cease or limit [Dentist's] practice of the profession if the PHMP case manager directs that [Dentist] do so." R.R. at 405a. This provision does not condition the direction to cease Dentist's practice of the profession on the Case Manager's reason being that the direction relates to the impairments under this agreement; Dentist's adherence, then, should have been absolute. As indicated, however, when the Case Manager directed Dentist to cease practicing dentistry with Direct Dental, Dentist refused. PAO at F.F. Nos. 30-33. Dentist's attitude toward these directions, and the prospect of an investigation into his compliance with the Consent Agreement, was decidedly cavalier. In fact, Dentist related: "[I]f PHMP desires to forward this to the legal office, I will be happy to address it with the legal office or in response to a [PAR]." R.R. at 474a-75a.

Elsewhere, Paragraph 7(e)(17) mandates that "[i]f a treatment provider recommends that [Dentist] obtain treatment, [Dentist] must fully comply with those recommendations as part of these probationary requirements." R.R. at 406a. Again, however, Dentist has not undergone Pine Grove's recommended treatment, PAO at F.F. No. 35, even though this provision of the Consent Agreement did not condition Dentist's completion of the treatment provider's recommendation on the degree of relation to Dentist's impairments.

Whatever the scope of Paragraph 7(e)(1) may be, it cannot be interpreted to alter the Board's suspension of Dentist's license in the face of Dentist's pervasive noncompliance. Indeed, even if we supply Paragraph 7(e)(1) with Dentist's desired narrow reading, it means only this: Dentist has violated 11, and not 12, provisions of the Consent Agreement. However, because the Consent Agreement is an expression of the Board's power to maintain discipline in the

12

profession as well as Dentist's acceptance of the strict terms contained therein, the scope of the ***entire*** Consent Agreement encompasses any hindrance to Dentist's ability to practice the profession with reasonable skill and safety.

Without belaboring this final point, we understand that Dentist's noncompliance was motivated by his "sincerely [] held but unjustified contentions" about the scope of the consent agreement, PAO at 19, and his concern that any treatment provider could arbitrarily suspend his practice until he complied with any treatment a provider imposed upon him. Dentist's Brief at 17. We note, however, that noncompliance was not the only remedy left to Dentist. The General Rules of Administrative Practice and Procedure (GRAPP) provide for the filing of both formal and informal complaints with administrative agencies like the Board. *See* Sections 35.5, 35.9 of the GRAPP, 1 Pa. Code §§35.5 (informal complaint), 35.9 (formal complaint). Dentist, therefore, could have sought recourse with the Board instead of ignoring the terms of the Consent Agreement and his Case Manager's directions. Regardless, given the fact pattern before us, neither the Board nor the Hearing Examiner erred on this point or by conditioning reinstatement on Dentist's compliance.[7]

### C. Three-year Suspension

Next, Dentist cautions that the object of discipline in these matters relates to the public's health and safety, rather than punishment of the licensee. Dentist's Brief at 26 (citing *Barran v. State Board of Medicine*, 670 A.2d 765, 767 (Pa. Cmwlth. 1996)). Thus, this Court may vacate the licensing board's decision

---

[7] To the extent that Dentist challenges the evidence of his violations as an issue discrete from the first issue discussed herein, the Hearing Examiner ably resolved this challenge below and we will not depart from his reasoning. *See* PAO at 14-19.

13

where the administrative board's discretion is exercised arbitrarily or unreasonably. *Id*. (citing *Edwards v. State Board of Funeral Directors*, 383 A.2d 564, 565 (Pa. Cmwlth. 1978)). Although Dentist acknowledges his failure to notify PHMP of his employment with Direct Dental and to notify Direct Dental of his participation in the Consent Agreement, Dentist argues that the Board's three-year suspension of his license is punitive. In his view, the Board's suspension discounts his sobriety as well as the length of his compliance with the PHMP. *Id*. at 27-28. Dentist believes that the suspension he has served since the filing of the PAR is more than sufficient to protect the public. *Id*.

In relevant part, the Board responds that "[i]t is disingenuous for [Dentist] to claim that the three-year penalty is punitive when the penalty for non-compliance was clearly stated in the [Consent] Agreement." Board's Brief at 31-32. Nor does the Board believe that Dentist's violations concerning his failure to notify PHMP concerning his employment with Direct Dental and his failure to provide Direct Dental with a copy of the Consent Agreement is any less significant than his failure to comply with the PHP's recommendations. Because Dentist's lack of candor prevented Direct Dental from providing the PHMP with evaluations concerning Dentist's performance or otherwise assisting the PHMP with monitoring Dentist – as required by the Consent Agreement – the Board believes that it exercised sound discretion when issuing Dentist's sanction. *Id*. at 31-32.

Indeed, Paragraph 7(f) of the Consent Agreement provides:

> Notification of a violation of the terms or conditions of this Agreement shall result in the **IMMEDIATE VACATING** of the stay order, **TERMINATION** of the period of probation, and **ACTIVATION** of the suspension in paragraph 7(e)[(three-year license suspension)] of [Dentist's] authorization to practice the profession in the Commonwealth of Pennsylvania . . . .

14

R.R. at 415a (emphasis in original). If this provision alone was not enough to justify the Board's sanction, the Board also considered the seriousness of Dentist's disregard for his reporting requirements under the Consent Agreement. Final Order at 11-12. We must therefore conclude that the Board did not abuse its discretion in sanctioning Dentist in a manner consistent with the Consent Agreement.

*D. Delegation*

Finally, Dentist offers a brief argument that the Board has impermissibly delegated its decision-making authority to the PHP in contravention of Section 11.1 of the Act, 63 P.S. §130g. The Board rightly responds that Dentist failed to preserve this issue for our review by failing to raise the issue before the Board on exceptions. Board's Brief at 25 (citing 1 Pa. Code.§35.213; *Mostatab, D.M.D v. State Board of Dentistry*, 881 A.2d 1271 (Pa. Cmwlth. 2005)).

Indeed, Section 35.213 of the GRAPP, provides that "[o]bjections to any part of a proposed report which is not the subject of exceptions may not thereafter be raised . . . and shall be deemed to have been waived." 1 Pa. Code §35.213 In this case, Dentist neglected to raise this claim until he filed briefing in the present appeal. Therefore, we must deem this issue to have been waived for our review.[8]

---

[8] *See also* Pennsylvania Rule of Appellate Procedure 1513 (failure to raise an issue in a petition for review will constitute grounds for waiver if the court is unable to address the issue based on the certified record); *Cohen v. State Board of Medicine*, 676 A.2d 1277, 1279 n.8 (Pa. Cmwlth. 1996) (issues not raised in a petition for review will not be addressed) .

## IV. Conclusion

Accordingly, the September 21, 2024 Final Order of the Board is affirmed.

_____
MICHAEL H. WOJCIK, Judge

16

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Joseph Anthony Ciampa, D.D.S.,   :
  :
           Petitioner   :
  :
        v.   : No. 1350 C.D. 2024
  :
State Board of Dentistry,   :
  :
           Respondent  :

# **O R D E R**

AND NOW, this 27th day of January, 2026, the Final Order of the State Board of Dentistry dated September 21, 2024, is **AFFIRMED**.

_____
MICHAEL H. WOJCIK, Judge